# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Norma Jean Hanson,                                    File No. 12-cv-961 (TNL)

        Plaintiff,

v.                                                                        **ORDER OPINION**

Carolyn W. Colvin,
*Acting Commissioner of Social Security*,

        Defendant.

---

Gerald S. Weinrich, Weinrich Law Office, 400 South Broadway, Suite 203, Rochester, MN 55904 (for Plaintiff); and

Ana H. Voss, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

Plaintiff Norma Jean Hanson brings the present case, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c). (Docket No. 9; *see also* Docket No. 21.)

This matter is before the Court on the parties' cross-motions for summary judgment. (Docket Nos. 10, 17.) Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment (Docket No. 10) is **DENIED**.

2. The Commissioner's motion for summary judgment (Docket No. 17) is **GRANTED**.

3. This matter is dismissed with prejudice.

4. The following memorandum is incorporated by reference.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: September____9_____, 2013                    _____*s/ Tony N. Leung*_____
                                                   Tony N. Leung
                                                   United States Magistrate Judge
                                                   for the District of Minnesota

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB in January 2008. (Tr. 44; *see also* Tr. 136, 139.) Plaintiff asserts that she has been disabled since June 1, 2005, due to chronic regional pain syndrome ("CRPS")[1] and depression. (Tr. 8, 44-45, 136.) Plaintiff's application was initially denied on April 11, 2008, and upon reconsideration on June 5, 2008. (Tr. 44, 47, 62, 67.) Plaintiff subsequently appealed the reconsideration determination by

---

[1] "[CRPS] is a chronic pain condition that can affect any area of the body, but often affects an arm or a leg." *Complex regional pain syndrome*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004456/ (last visited August 2, 2013). CRPS is characterized by pain that (1) "[i]s intense and burning, and is much stronger than would be expected for the type of injury that occurred"; (2) "[g]ets worse, rather than better over time"; and 3 "[b]egins at the point of injury, but often spreads to the whole limb, or to the arm or leg on the opposite side of the body." *Id.* CRPS is also known as reflex sympathetic dystrophy syndrome. *Id.*

requesting a hearing before an administrative law judge ("ALJ"). (Tr. 70, 76, 98, 105; *see also* Tr. 258.)

A hearing was held before the ALJ on January 8, 2010. (Tr. 8, 98, 105.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Counsel, which denied her request for review. (Tr. 1, 8.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., Docket No. 1.) Plaintiff moved for summary judgment on August 27, 2012 (Docket No. 10), and the Commissioner filed a cross motion for summary judgment on November 5, 2012 (Docket No. 17). This matter is now fully briefed and ready for a determination on the papers.

## II. RELEVANT MEDICAL HISTORY

Plaintiff challenges only the ALJ's findings and decision concerning the effects of her CRPS and, therefore, the Court focuses on those records relevant to this impairment.

### A. 2003 and Earlier

Plaintiff's CRPS emerged after a 2002 work-related injury to her left knee. (Tr. 279, 290, 308.) Plaintiff's medical records show that she was seen for knee pain at the Olmsted Medical Center beginning in early 2003 and she was diagnosed with CRPS the same year. (Tr. 307, 309.)

### B. 2004

At least as early as January 2004, Plaintiff was receiving auricular acupuncture treatment for knee pain from Robert K. Yang, M.D., at the Mayo Clinic. (Tr. 301, 300, 299.)

On January 8, 2004, Plaintiff was seen by Elizabeth Huntoon, M.D., at the Mayo Clinic. (Tr. 299.) Plaintiff reported that the acupuncture she received from Dr. Yang helped with her pain. *(Tr. 299.)* Plaintiff also reported some pain relief from soaking in a hot tub. (Tr. 299.) In addition, Plaintiff reported some swelling as the result of her Lamictal[2] prescription and difficulty sleeping as she would wake up when the blankets touched her leg. (Tr. 299.) Dr. Huntoon directed Plaintiff to decrease her Lamictal intake and resume taking Neurontin[3], which had previously provided "excellent pain relief, although not complete" relief. (Tr. 299.) Dr. Huntoon also recommended that Plaintiff slowly increase the number of hours she worked per shift from four to five hours, but continue working in the morning as Plaintiff appears better to tolerate her pain at this time. (Tr. 299.)

Plaintiff had two additional sessions of auricular acupuncture with Dr. Yang in January and one in early February. (Tr. 289, 297, 298.) Plaintiff continued to report that the acupuncture helped manage her pain. (Tr. 289, 297, 298.)

On February 12, Plaintiff had a follow-up appointment with Dr. Huntoon. Plaintiff reported that she had been able to tolerate the increased work hours until her husband was injured and her overall activity level was increased in order to assist him. (Tr. 295.) Plaintiff stated that she had some increased swelling in her leg, but noted that the acupuncture was helping decrease her pain. (Tr. 295.) Dr. Huntoon observed that

---

[2] Lamictal is a brand name for lamotrigine, an anticonvulsant medication often used along with other medication to "[t]reat[] certain types of seizures and mood disorders." *Lamotrigine (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010856/?report=details (last visited Aug. 2, 2013).

[3] Neurontin is a brand name for gabapentin and "works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system." *Gabapentin (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010419/?report=details (last visited Aug. 2, 2013).

Plaintiff's range of motion in her knee "is limited actively to 90 degrees secondary to extreme pain," noted some swelling, and documented "somewhat diminished" strength in Plaintiff's lower extremities "secondary to pain inhibition." (Tr. 295.) Dr. Huntoon advised Plaintiff to reduce her Neurontin by one pill per week until her pain increases or she experiences side effects, continue working five-hour shifts, and schedule a follow-up appointment in one month. (Tr. 295.)

Plaintiff had an additional acupuncture session with Dr. Yang in February, where she continued to report positive results. (Tr. 294.) Plaintiff's Neurontin prescription was also refilled in March. (Tr. 293.)

Plaintiff next saw Dr. Huntoon in April. At this time, Dr. Huntoon noted that Plaintiff had undergone an independent medical examination in connection with her worker's compensation claim, during which the physician determined that Plaintiff did not have CRPS and Plaintiff should be able to return to work without restrictions. (Tr. 290.)

During this visit, Dr. Huntoon reviewed Plaintiff's electronic medical record and the report prepared by the independent medical examiner. (Tr. 290.) Dr. Huntoon noted that Plaintiff had been treated for CRPS since approximately March 2003, at which time Plaintiff reported that her "knee would get cold and turn red or purple as the day went on, and she would also experience swelling." (Tr. 290.) Plaintiff's physician at the time observed that Plaintiff's "skin was mottled in appearance, and that she lacked full flexion of the knee because of pain, and that the knee was swollen inferior to the patella," but the temperature of the knee was normal. (Tr. 290.) An October 2002 MRI "showed

abnormal signal of posterior horn of the medial meniscus, which was suggestive of an intrameniscal degeneration or subtle noncomplex tear." (Tr. 290.) Plaintiff was then referred to Dr. Huntoon, who began treating Plaintiff in April 2003. (Tr. 290.) During Plaintiff's first visit, Dr. Huntoon observed mild swelling in Plaintiff's left femur down to her foot. (Tr. 290.) Dr. Huntoon started Plaintiff on Neurontin and ordered a CRPS screening. (Tr. 290.) The April 2003 screening was found to be abnormal and a CT scan performed during the same time period showed "minimal spotty demineralization about the knee." (Tr. 290.) A prior February 2003 bone scan was "positive with findings suggesting vasomotor instability." (Tr. 290.) A September 2003 x-ray was considered negative. (Tr. 290.)

Overall, Dr. Huntoon observed that Plaintiff has "continued to have swelling of the left knee and exquisite pain." (Tr. 290.) Dr. Huntoon noted that Plaintiff had reported that she was unable to shave her knee because of the knee's hypersensitivity. (Tr. 290.) Dr. Huntoon also noted that Plaintiff has tried "a variety of medications" for pain with the most effective being Neurontin, which did not completely resolve her pain. (Tr. 290.) Dr. Huntoon concluded that, while the presentation of Plaintiff's CRPS was "atypical," she opined that Plaintiff had CRPS and "the diagnosis is clearly supported by multiple physicians at this institution." (Tr. 290.)

Dr. Huntoon noted that Plaintiff had "exquisite sensitivity to light touch" during the visit and ordered x-rays of both Plaintiff's knees as well as portions of her tibia and femur. Dr. Huntoon also referred Plaintiff to another physician to discuss pain management with lumbar sympathetic blocks as compared to spinal cord stimulation.

(Tr. 291.) Ultimately, Dr. Huntoon diagnosed Plaintiff with "[a]typical presentation of CRPS." (Tr. 290.) Plaintiff was also given a Neurontin prescription along with work restrictions to elevate her leg as needed, continue five-hour shifts, and work only during the morning hours. (Tr. 302.)

Plaintiff's Neurontin prescription was again refilled in June. (Tr. 288.)

In November, Plaintiff returned to the Olmsted Medical Center, where she was seen by Timothy Gabrielsen, M.D. (Tr. 307.) Plaintiff told Dr. Gabrielsen that her worker's compensation coverage was recently "denied" and she was concerned about receiving her prescriptions. (Tr. 307.) Dr. Gabrielsen continued Plaintiff's nortriptyline[4] and Neurontin prescriptions for one month and told Plaintiff she would need to follow up with the Mayo Clinic. (Tr. 307.)

Plaintiff returned to the Olmsted Medical Center again in December, requesting that her prescriptions be refilled. Plaintiff reported that she has not been able to be seen at the Mayo Clinic because of outstanding bills that were not being covered by worker's compensation. (Tr. 308.) Plaintiff also reported that a hearing concerning the worker's compensation coverage had been rescheduled to January. (Tr. 308.) Plaintiff was seen by Judith Hass, C.N.P., who extended Plaintiff's prescriptions for another month. (Tr. 308.)

---

[4] Nortriptyline is used to treat both depression and pain. *Nortriptyline*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011451/ (last visited September 3, 2013).

### C. 2005

Still involved in litigation over worker's compensation coverage, Plaintiff was next seen at the Olmsted Medical Center in January 2005. (Tr. 309.) This time, Plaintiff was seen by Victoria Dietz, M.D. (Tr. 310.) Plaintiff told Dr. Dietz that she would like to continue treatment with the Mayo Clinic but was not able to do so until the coverage issue is resolved. (Tr. 309-10.) Dr. Dietz noted that Plaintiff walked with a cane and did not have clothing covering her lower left leg due to the discomfort it caused. (Tr. 309.) Dr. Dietz gave Plaintiff one-month prescriptions of both Neurontin and nortriptyline along with two refills. (Tr. 310.) Dr. Dietz also continued the work restrictions given by Dr. Huntoon. (Tr. 310.)

With her worker's compensation issues resolved, Plaintiff returned to Dr. Huntoon in April. (Tr. 331, 361.) Plaintiff appears to have presented in a wheelchair. (Tr. 331, 361.) Plaintiff reported that she continues to have persistent pain in her left knee and also "has a marked amount of weight gain over the past several months," which Plaintiff attributed to her decreased activity. (Tr. 331, 361.) Plaintiff told Dr. Huntoon that her pain is creeping up her leg and into her low back and that standing for an extended length of time produces "severe back spasms which require[] her to sit down and rest." (Tr. 331, 361.) Plaintiff stated that "[s]he is able to sit for [an] extended period of time without too much difficulty as long as her left leg is elevated approximately 20 to 30 degrees." (Tr. 331, 361.) Plaintiff also reported that she had been dismissed from her job and was no longer working. (Tr. 331, 361.)

Upon examination, Dr. Huntoon noted that Plaintiff's left leg was "somewhat swollen compared to the right and slightly more erythematous" with mild tenderness over the lower leg and "exquisite[] tender[ness]" over her knee. (Tr. 331, 361.) Additionally, Dr. Huntoon noted that Plaintiff "is able to raise her leg off the wheelchair with hip flexion graded on the left at 4/5 secondary to pain. Dorsiflexion is 4/5 and somewhat rachety, possibly secondary to pain in the knee with this movement. Extenor hallucis longus 3/5 and ratchety." (Tr. 331, 361.) While Dr. Huntoon stated that "[k]nee flexion and extension [were] not tested due to patient discomfort," Dr. Huntoon subsequently described Plaintiff's left knee flexion "to 90 degrees, extension lacks 5 degrees full extension." (Tr. 331, 361.) Dr. Huntoon continued Plaintiff's nortriptyline and Neurontin prescriptions and encouraged Plaintiff to increase her activity level despite the discomfort. (Tr. 331, 362.)

Plaintiff was next seen by Dr. Huntoon roughly three months later in July. (Tr. 359.) Plaintiff again presented in a wheelchair. (Tr. 359.) Plaintiff reported that her pain has worsened over the last year and was further aggravated over the last month or so due to a fall. (Tr. 359.) Plaintiff told Dr. Huntoon that her knee and lower left leg swell and discolor in the afternoon. (Tr. 359.) Plaintiff also stated that she feels her CRPS is traveling up to her hip region. (Tr. 359.) Plaintiff was able to tolerate increased doses of Neurontin "to two pills in the morning, three in the afternoon, and three in the evening," which helped with her pain. (Tr. 359.) Plaintiff also continued to take nortriptyline. (Tr. 359.) Plaintiff told Dr. Huntoon that she is trying to remain mobile and walk, but continues to be in pain. (Tr. 359.)

Dr. Huntoon noted that Plaintiff's left leg was elevated in a wheelchair and appeared swollen in comparison with Plaintiff's right leg. (Tr. 359.) She also noted:

> There is some mild erythematous discoloration around the knee joint, and her skin does appear to be shiny. . . . Ankle and toe movement is good with some discomfort. The patient retains the ability to flex the knee on the left to approximately 90 degrees and can full extend. Palpitation is exquisitely tender and not attempted at this time. Of note, her daughter was in the room with us and accidentally bumped the lateral side of her knee which resulted in a great deal of pain.

(Tr. 359.) Dr. Huntoon increased both of Plaintiff's prescriptions and directed Plaintiff to follow up with her in one to two months in order to monitor the medication adjustments. (Tr. 359.)

Plaintiff followed up with Dr. Huntoon in early September. (Tr. 358.) Plaintiff reported that her pain continues and, when she tried to increase her activity level, the Neurontin did not adequately control her pain. (Tr. 358.) In her notes, Dr. Huntoon wrote, "The pain over the past several months has begun to ascend up her leg and into her hip region making it additionally difficult for [Plaintiff] to engage in form [sic] of physical activity which has been recommended." (Tr. 358.) Dr. Huntoon noted that Plaintiff's weight was now between 210 and 220 pounds because of her inability to exercise. (Tr. 358.) Dr. Huntoon prescribed an ab-lounger as a means of encouraging movement and strengthening core muscles "in an unweighted position." (Tr. 358.) Dr. Huntoon continued Plaintiff's Neurontin prescription at its current level and referred Plaintiff for an MRI to determine whether a prior abnormality could be the source of Plaintiff's pain. (Tr. 358.)

An MRI of Plaintiff's left knee was taken later that month and compared with images from October 2002. (Tr. 343.) M. Frick, M.D., noted "[n]o significant interval change." (Tr. 343.) Dr. Frick also made the following observations: "The cruciate and collateral ligaments and both menisci are intact and normal in appearance. Mild chondromalacia patellae. Since the prior study, the subcutaneous edema and fluid along the deep myofascial plane at the posterolateral aspect of the proximal calf has resolved." (Tr. 343.)

### D. 2006

Plaintiff next saw Dr. Huntoon in January 2006. (Tr. 357.) Although Plaintiff continued to have pain in her left knee, Dr. Huntoon described her condition as "stable." (Tr. 357.) Plaintiff reported being under a great deal of stress due to health concerns with her husband. (Tr. 357.) Dr. Huntoon noted that Plaintiff had lost approximately 20 pounds. (Tr. 357.) Dr. Huntoon increased Plaintiff's noritriptyline and kept Plaintiff's Neurontin at current levels. (Tr. 357.)

Plaintiff saw Dr. Huntoon again in late March. (Tr. 355.) Plaintiff reported that her pain was worse with the increased stress of her husband's medical condition and her role as his primary caregiver. (Tr. 355.) Plaintiff told Dr. Huntoon that "[s]he uses a wheelchair for longer distances and attempts to walk extremely short distances in the home." Plaintiff also reported that a family friend had moved in to help with chores. (Tr. 355.) In addition, Plaintiff raised concern over brown patches on her left knee, which appeared to be getting worse. Plaintiff stated that she was afraid to touch the skin patches

given her sensitivity.  (Tr. 353.)  Dr. Huntoon examined the patches and concluded that they were due to stress.  (Tr. 355.)

Dr. Huntoon suggested that Plaintiff repeat a lumbar sympathetic block, a procedure Plaintiff had in 2003 which gave her significant though short-term pain relief. (Tr. 355.)  Dr. Huntoon also continued Plaintiff's prescriptions.  (Tr. 355.)  Plaintiff subsequently received the lumbar sympathetic block on her left side on March 30, 2006. (Tr. 344.)

**E.  2007**

Plaintiff did not see Dr. Huntoon again until over a year later.  (Tr. 353.)  At this appointment in late April, Plaintiff stated that she is trying to walk short distances, but is having difficulty.  (Tr. 353.)  Plaintiff reported that "[s]he is able to walk approximately 30-50 feet from the house to the barn and back again and finds that her back will spasm up."  (Tr. 353.)  Plaintiff also reported that the pain was moving up her leg into her back. (Tr. 353.)  When asked, Plaintiff stated that she does not have a specific exercise program, but tries to do some stretching of her back in the morning and expressed interest in physical therapy.  (Tr. 353.)

Dr. Huntoon observed that Plaintiff's legs were not swollen at this time, but the lower extremities were appeared "modeled."  (Tr. 353.)  Plaintiff was fully able to extend and flex her left knee despite some discomfort.  (Tr. 353.)  The knee, however, remained "exquisitely tender to light touch at about 3 inches below and 2 inches above the knee itself."  (Tr. 353.)  Dr. Huntoon noted that "[p]alpation of the posterior surface of the knee in the popliteal fossa [was] nontender today."  (Tr. 353.)  The brown patches

Plaintiff previously reported had retreated. (Tr. 353.) Dr. Huntoon also noted that Plaintiff's weight had increased to approximately 220 pounds. (Tr. 353.) Dr. Huntoon discussed a plan to begin reducing Plaintiff's Neurontin prescription and start physical therapy. (Tr. 353.)

Plaintiff met with physical therapist J.H. Carpenter on May 21. (Tr. 351.) Plaintiff told Carpenter that her pain "only occurs with walking or prolonged standing" and it usually goes away within 15 minutes if she sits down. (Tr. 351.) Plaintiff stated that she was only able to walk between 30 and 50 feet without pain. (Tr. 351.) Carpenter noted that Plaintiff

> is tender to palpation over the right upper SI area. Lumbar motion is mildly limited in flexion, but normal in all other motions. Could not do muscle testing of left lower extremity as I could not touch the left below the upper thigh. The right lower extremity appears to have normal strength. Gait is antalgic on the left.

(Tr. 351.)

Carpenter recommended four to six sessions of therapy and instructed Plaintiff in abdominal bracing and accompanying exercises. (Tr. 351.) Carpenter noted that the potential for pain relief on Plaintiff's left side was uncertain given that Plaintiff experienced pain in her left leg with the single-bent-knee lifts. (Tr. 351.)

Plaintiff returned about one week later for another session with Carpenter. (Tr. 350.) Carpenter noted that Plaintiff was able to tolerate single-knee-to-chest stretches as well as tolerating abdominal bracing with single-arm and single-bent-knee lifts. (Tr.

350.)  Plaintiff was not, however, able to do any cycling.  (Tr. 350.)  Carpenter continued Plaintiff's regimen and instructed Plaintiff to return in one week.  (Tr. 350.)

Plaintiff had an additional two therapy sessions in June.  (Tr. 349, 348.)  These sessions were both with physical therapist S.W. Bandel.  (Tr. 349, 348.)  Bandel gave Plaintiff some aerobic exercises to do in her outdoor spa as well as progression exercises, including bridging, unilateral abdominal bracing, partial abdominal curls, and lower-trunk rotation. (Tr. 349.)  Plaintiff reported that her pain improved with the exercises and now mostly occurred with standing.  (Tr. 348.)  Bandel reviewed the exercises with Plaintiff and then placed Plaintiff on a home exercise program.  (Tr. 348.)

Plaintiff was next seen by Samuel H. Halverson, P.A.-C., on November 5, 2007, at Olmsted Medical Center, where she presented with right-ankle pain.  (Tr. 363.)  Plaintiff reported that the pain began somewhat suddenly, without any precipitating injury, and was worse when she attempted to place any weight on her ankle.  (Tr. 363.)  Plaintiff also reported needing a cane in order to walk.  (Tr. 363.)

Halverson noted Plaintiff's history of CRPS in her left knee, including both extreme pain and hypersensitivity to light touch.  (Tr. 363.)  Halverson also noted that Plaintiff "avoids wearing long trousers because of the contact which causes a lot of pain in the left knee area."  (Tr. 363.)  Halverson observed that Plaintiff was "in no acute distress as seen sitting," but found "it difficult to bear weight on both lower extremities and uses a cane for ambulation."  (Tr. 363.)

With respect to Plaintiff's right ankle, Halverson observed:

> Inspection of the right ankle reveals some mild swelling of the soft tissue medially. The landmarks laterally are easily visualized. However, the medial malleolus is not apparent to gross inspection. There is no tenderness over the bony architecture. Percussion to the lateral and medial malleolus results in no tenderness. There is no gross instability. She has good plantar flexion and dorsiflexion without difficulty. There is some tenderness medially with rotational and avulsion movements. There is some soft tissue swelling distal to the medial malleolus, and there is tenderness with pressure to the soft tissue swelling. There is no pain with percussion to the heel. There is no tenderness along the plantar fascia. No pain is elicited with forced extension/flexion of the distal foot or toes.

(Tr. 363.) Halverson also had Plaintiff's right foot x-rayed, which revealed a small heel spur. (Tr. 363, 369-70.) Halverson gave Plaintiff a stirrup splint for her right foot and referred Plaintiff for an orthopedic consultation. (Tr. 363)

The following week, Plaintiff met with Myron O. Kaminsky, D.P.M. (Tr. 364.) Plaintiff reported pain in her right ankle and Kaminsky noted that the ankle was swollen "medially, specifically over the course of the posterior tibial tendon." (Tr. 364.) In addition, "[n]eurological review reveals some paresthesias distally over the course of the posterior tibial nerve with a positive Tinel's sign and tingling of the 4th and 5th toes of the right foot." (Tr. 364.) Kaminsky observed that Plaintiff "favors her left knee and applies significant pressure on her right foot." (Tr. 364.) Kaminsky also observed that Plaintiff's heel spur did not cause her discomfort; there were no known ankle abnormalities; Plaintiff's "muscle strength is +4/5 for dorsiflexion, plantar flexion, inversion, and eversion"; and "[c]apillary refill of the digits is less than 3 seconds." (Tr. 364.)

Kaminsky diagnosed Plaintiff with right posterior tibial tendonitis and flat feet. (Tr. 364.) Plaintiff was given "a Hi-Top walker and cast brace" and instructed to follow up in two weeks. (Tr. 364.) Kaminsky opined that Plaintiff's right ankle pain "is most likely secondary to compensatory gait secondary to her left knee pain." (Tr. 364.)

Plaintiff followed up with Kaminsky in early December. (Tr. 366.) Plaintiff reported still having pain in her right ankle. (Tr. 366.) Kaminksy noted that Plaintiff "is unable to bear weight at home without the cast brace and even with the cast brace continues to be symptomatic." (Tr. 366.) Kaminsky placed Plaintiff in a "short-leg cast" and instructed her to follow up with him in one week. (Tr. 366.)

Plaintiff reported improvement in her ankle when she saw Kaminsky the following week. (Tr. 367.) Kaminsky noted that Plaintiff "has good active and passive range of motion of her toes. . . [and i]s able to ambulate comfortably." (Tr. 367.) Kaminksy also reviewed the x-rays ordered by Halverson and concluded Plaintiff had a "large heel spur" rather than a small one. (Tr. 367.) Additionally, Kaminsky noted that there was "no significant osseous abnormalities at the level of the midfoot," "some residual metarsus abductus," "minimal evidence of any arthritic changes," and "no evidence of any significant osseous abnormalities" in Plaintiff's right foot. (Tr. 367.) Kaminsky instructed Plaintiff to return in two weeks for follow up and removal of the cast. (Tr. 367.)

At Plaintiff's next appointment with Kaminsky in late December, the cast was removed. (Tr. 368.) Upon removal, Kaminsky noted that Plaintiff had no pain in her right ankle or rear foot; there was no evidence of paresthesias or burning sensations; and

there was no redness or swelling present.  (Tr. 368.)  Kaminsky gave Plaintiff an ankle brace and discussed orthotics and proper footwear with her.  (Tr. 368.)

### F.  2008

On August 25, 2008, Plaintiff returned to the Mayo Clinic with pain in her right foot.  (Tr. 419.)  She was seen by Russell Gelfman, M.D.  (Tr. 419.)  Dr. Gelfman noted that Plaintiff was wearing an ankle brace and had orthotics in both shoes.  (Tr. 419.)  Plaintiff reported difficulty walking, but no numbness or weakness.  Dr. Gelfman also noted that Plaintiff walks with a cane.  (Tr. 419.)

When examining Plaintiff's right foot, Dr. Gelfman observed "a slight amount of fullness of the right mid foot" and "tenderness in the mid foot on the right rather diffusely."  (Tr. 420.)  Dr. Gelfman noted that Plaintiff "has normal distal lower extremity strength, normal right lower extremity reflexes, and left ankle reflex."  (Tr. 420.)  Dr. Gelfman was not able to test Plaintiff's left knee due to hypersensitivity, but noted that Plaintiff's right foot was not hypersensitive.  (Tr. 420.)  Further, Plaintiff "has intact pinprick sensation, perhaps a little less sensitive on the right foot as compared to the left.  Her straight leg raise is negative.  Her gait is antalgic, most related to the left knee, but she could also not do a toe rise on the right due to foot pain."  (Tr. 420.)  Dr. Gelfman concluded that a bone scan of Plaintiff's right foot would be helpful.  (Tr. 420.)

### G.  2009

Plaintiff next saw Dr. Gelfman approximately one year later for a follow-up appointment and medication review.  (Tr. 425; *see also* Tr. 267.)  Plaintiff reported that she felt "her condition is slowly worsening" and is having "more discomfort in the right

lower extremity including the right foot." (Tr. 425.) Plaintiff also reported that her right

knee was "starting to become symptomatic." (Tr. 425.) Upon examination, Dr. Gelfman

observed:

> She has a slight amount of swelling of the left as compared to
> the right lower extremity. There is no warmth, but there is
> hypersensitivity and allodynia of the left knee. Right knee is
> less sensitive, and the right foot is not painful on palpation.
> Distal lower extremity strength is normal as is touch
> sensation.

(Tr. 425.) Dr. Gelfman renewed Plaintiff's Neurontin and nortriptyline prescriptions,

noting that he discussed the possibility of spinal cord stimulation to treat Plaintiff's pain.

(Tr. 425.) Plaintiff was directed to follow up with Dr. Gelfman in one year. (Tr. 425.)

### III. DIB-RELATED EXAMINATIONS & ASSESSMENTS

**A. 2005**

Plaintiff filed a previous request for disability benefits in January 2005. (Tr. 39,

129, 139, 272.) In a 2005 interview, the interviewer noted that Plaintiff walked slowly

with a cane and appeared unbalanced. (Tr. 163.) During the interview, Plaintiff stated

that she needed to keep her foot elevated on a chair while sitting in order to minimize the

pain. (Tr. 163.)

A friend of Plaintiff's completed a function report in 2005 as well. Plaintiff's

friend described Plaintiff's activities as "not much," stating Plaintiff "sits a lot between

doing dishes, cooking," reclining or sitting at the table with her leg elevated due to severe

leg pain. (Tr. 174.) Plaintiff's friend also stated Plaintiff cannot wear anything on her

leg because of the pain, sometimes receives assistance with bathing and uses a shower

chair, only wears easy hairstyles, is able to feed herself, and has grab bars installed in her bathroom. (Tr. 175.) Plaintiff's friend stated that Plaintiff tries to prepare meals, but it takes her four times as long to prepare things and she needs assistance with big meals or canning. (Tr. 176.)

In addition, Plaintiff's friend stated that Plaintiff has difficulty driving, but does do so on occasion. (Tr. 177.) Plaintiff's friend stated that Plaintiff shops for an hour or more with the assistance of an electric cart and also shops by phone and on her computer. (Tr. 177.) Plaintiff's hobbies were described as sewing, reading, playing cards, and watching television. (Tr. 178.) Plaintiff's friend stated that Plaintiff is not able to "sew much," and, most recently, Plaintiff seems to be concentrating on finding ways to be comfortable. (Tr. 178.) Plaintiff's friend stated that Plaintiff will socialize with others when they visit her and by phone. (Tr. 178.)

As for Plaintiff's physical limitations, her friend stated that Plaintiff has difficulty lifting, squatting, bending, standing, reaching, sitting, walking, kneeling, and climbing stairs, noting that she often is "just sitting in her home resting." (Tr. 179.) Plaintiff's friend also stated that Plaintiff fears falling and worries about "bad pain hitting her at odd times." (Tr. 180.) Plaintiff's friend stated that Plaintiff uses a single crutch, cane, and wheelchair. (Tr. 180.)

Plaintiff also completed a function report around the same time. (Tr. 183.) In describing a typical day, Plaintiff stated that she was usually up by 5:30 a.m. as she is frequently woken up by leg pain, makes sure her daughter gets on the bus, washes dishes with breaks to sit down and elevate her leg, and then sits with her leg elevated until her

husband comes home. (Tr. 183.) Plaintiff's husband then helps prepare dinner and her daughter cleans up afterwards. (Tr. 183.) Plaintiff stated that she usually spends the rest of the night sitting with her leg elevated. (Tr. 183.) Plaintiff stated that she is usually in pain for most of the night and must sleep with her leg outside of the covers and a pillow between her knees. (Tr. 184.)

In describing her previous activities, Plaintiff said that she used to work outside of her home, do household chores, cook, can, cut wood, work on vehicles, work in her yard, and attend to fencing for her animals. (Tr. 184.) As a result of her condition, Plaintiff stated that she wears loose clothing, wears simple hairstyles, uses a shower chair when bathing, and relies on handicap bars when going to the bathroom. (Tr. 184.) Plaintiff stated that her husband and daughter help with the cooking and, on holidays, she receives assistance from family and friends. (Tr. 185.) Plaintiff said that she has to take breaks when cooking, sitting down and elevating her leg. (Tr. 185.) Similarly, Plaintiff's husband, daughter, and friends help with yard work. (Tr. 185-86.)

Plaintiff stated that she goes out very little and has difficulty driving due to pain. (Tr. 186.) When she does go shopping, Plaintiff stated that it usually takes her about three hours in stores and she uses an electric cart or wheelchair. (Tr. 186.) Plaintiff described her hobbies as reading, watching television, sewing, playing cards, and working on her computer. (Tr. 187.) Plaintiff does these activities while sitting with her leg elevated. (Tr. 187.) As for socializing with others, Plaintiff stated that friends will visit her and assist with things around the house and she also talks to friends on the telephone. (Tr. 187.)

As for her physical limitations, Plaintiff said she has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. (Tr. 188.) Plaintiff also stated that she is often short with people due to her pain. (Tr. 188.) Plaintiff stated that she can only walk about ten feet before she needs to take a five to ten-minute break. (Tr. 188.) Plaintiff stated that she is easily stressed, which also aggravates her CRPS. (Tr. 189.) Plaintiff stated she feared not being able to get out of bed and falling. (Tr. 189.) Plaintiff also said that she uses a crutch, cane, and wheelchair and will use an electric cart when shopping in stores. (Tr. 189.) Plaintiff said that her house "is set up with chairs throughout the house" in order for her to sit down when needed. (Tr. 189.)

On March 18, 2005, Alan Suddard, M.D., conducted a physical residual functional capacity assessment of Plaintiff. (Tr. 313, 323.) Dr. Suddard concluded that Plaintiff could both occasionally and frequently lift 10 pounds; stand and/or walk for at least two hours in an eight-hour day; sit for about six hours in an eight-hour day; and was otherwise unlimited in her ability to push or pull. (Tr. 314.) Dr. Suddard assessed Plaintiff's physical residual functional capacity as sedentary, noting that, while Plaintiff's physician "had advised only 4 hours work a day," "this was described as odd jobs such as routine housework" and Plaintiff reported relief from Neurontin. (Tr. 314.)

Dr. Suddard restricted Plaintiff from kneeling and crawling, but opined that Plaintiff could occasionally climb, balance, stoop, and crouch. (Tr. 315.) Dr. Suddard concluded Plaintiff had no manipulative, visual, or communicative limitations, and Plaintiff's environmental limitations were unlimited with the exception of extreme cold

and vibration, to which Plaintiff was to avoid even moderate exposure. (Tr. 316-17.) Additionally, Dr. Suddard noted that Plaintiff "has not required numerous physician interventions in recent months." (Tr. 314.)

Plaintiff subsequently completed an additional questionnaire, stating that standing or walking for any distance causes a burning sensation in her hip. (Tr. 203, 204.) Plaintiff also said she had difficulty getting in and out of the bath and shower. (Tr. 206.) Plaintiff explained that she has a chair next to the sink when washing dishes and cooks while sitting on a stool. (Tr. 206.)

Dr. Suddard's assessment was affirmed by Daniel Larson, M.D., on May 23, 2005. (Tr. 335; *see* Tr. 415.) Plaintiff's request for benefits was later denied on May 31, 2005. (Tr. 213.)

**B. 2008**

Plaintiff completed another questionnaire in 2008, this time in connection with the application presently at issue. (Tr. 216.) Plaintiff stated that she was disabled due to CRPS, which made her left knee very sensitive and subject to swelling. (Tr. 216.) Plaintiff stated that she must elevate her knee and is not able to stand for more than 15 minutes at a time. (Tr. 216.) Plaintiff also stated that she had developed tendonitis in her right foot from leaning on it and uses crutches or a cane to get around. (Tr. 216.)

Plaintiff also completed a function report in 2008. (Tr. 232.) Plaintiff's daily routine and personal care remained much the same, except that she was now bracing her right foot and ankle. (Tr. 232, 233, 238.) Plaintiff frequently sat during the day in order to elevate her leg. (Tr. 232; *see also* Tr. 236.) Plaintiff still cooked meals, although she

now uses a stool when cooking, and also did her daughter's laundry.  (Tr. 233, 234, 239.)

Plaintiff also performed limited cleaning for approximately two hours twice per month.

(Tr. 234.)  Plaintiff also said that she "had to buy a different mower in order to mow the

lawn."  (Tr. 234; *see also* Tr. 239.)

Plaintiff still drove and used a cane or crutches while walking.  (Tr. 235, 238.)

Now, in addition to using an electric cart or wheelchair, Plaintiff also tried to "line up

help for grocery shopping" and tried to limit her trips to twice per month, giving others

lists of things to get when needed.  (Tr. 235, 238.)  Plaintiff talked with friends and

checked her e-mail on a daily basis, and still sewed occasionally.  (Tr. 236.)  Plaintiff

noted that she still had difficulty lifting, squatting, bending, standing, walking, kneeling,

and climbing stairs due to her left knee.  (Tr. 237.)  Plaintiff remained able to walk

between 10 and 15 feet before needing a break, which usually lasted 20 minutes.  (Tr.

237.)

On April 10, 2008, Charles T. Grant, M.D., conducted a physical residual

functional capacity assessment of Plaintiff.  (Tr. 397.)  With respect to Plaintiff's

exertional limitations, Dr. Grant found that Plaintiff was capable of performing at the

same levels assessed by Dr. Suddard with one exception.  (Tr. 399.)  While Dr. Suddard

concluded that Plaintiff could lift 10 pounds occasionally, Dr. Grant concluded that

Plaintiff could lift 20 pounds occasionally.  In support of his conclusions, Dr. Grant noted

that Plaintiff has had chronic pain since her knee injury in 2002, "failed various treatment

modalities[, ] and . . . been diagnosed with [CRPS]."  (Tr. 399.)  Dr. Grant also concluded

that Plaintiff's "[p]ain is in excess of objective findings, but is partially credible and

reduces the RFC to sedentary." (Tr. 403.) Like Dr. Suddard, Dr. Grant found no manipulative, visual, or communicative limitations. (Tr. 401-02.) In contrast to Dr. Suddard, however, Dr. Grant also found no postural or environmental limitations. (Tr. 400, 402.)

In May, Plaintiff completed an additional questionnaire in which she reported no changes in her condition since her last report. (Tr. 244-46.) Plaintiff also reported no changes in her condition the following month. (Tr. 252-56.) On June 5, 2008, Dr. Grant's assessment was affirmed by Dr. Larson. (Tr. 415.)

## IV. PROCEEDINGS BEFORE THE ALJ

### A. Hearing Testimony

At the hearing before the ALJ, Plaintiff testified that a family friend has lived with her for the past three years and assists with household chores and outside maintenance. (Tr. 23.) Plaintiff testified that she has two gardens that her daughter and family friend help her tend. (Tr. 25.)

Plaintiff explained that she left her prior employment after a worker's compensation settlement. (Tr. 27.) Plaintiff twisted her knee while pulling product from a machine. (Tr. 27.) Plaintiff stated that she has looked for work since that time, including running a restaurant and working as a home health aide in a nursing home. (Tr. 27.) Plaintiff stated that she last applied for a position as an apple sorter approximately two years ago, figuring she could sit and sort apples, but was not hired because she was unable to lift more than ten pounds. (Tr. 27.)

Plaintiff testified that she was most recently self-employed. (Tr. 24.) Plaintiff testified that, over the past two years, she has been trying to start a plant nursery because this is an activity she can do sitting down. (Tr. 24.) Plaintiff explained that she has a greenhouse and begins planting seeds in February. (Tr. 24.) Plaintiff then nurtures the plants and sells them in May and June. (Tr. 24.) When the greenhouse is open, Plaintiff testified that she works approximately 35 to 40 hours per week in a sitting position with her leg elevated. (Tr. 32.) Plaintiff stated that she is able to work in approximately three-hour increments followed by a 20 to 30 minute break. (Tr. 32.)

In 2011, Plaintiff made less than $400 by selling vegetables from her gardens. (Tr. 25.) Plaintiff testified that she is currently limited in the amount of space she has to grow the plants (a 10' x 18' shed converted into a greenhouse) and hopes to eventually expand the operation into several greenhouses on her six-acre property. (Tr. 24-25.) Plaintiff testified that her daughter and the family friend would assist her. (Tr. 25.) Plaintiff also testified that she has received estimates for construction of the greenhouses. (Tr. 26.) In addition to gardening, Plaintiff testified that she enjoys sewing, which she does primarily during the winter. (Tr. 27.)

When asked if she felt she could sit for eight hours per day, five days per week, Plaintiff responded, "Eight hours would be pushing it" because her leg starts hurting when it is down for any amount of time and the pain travels up into the back of her hips. (Tr. 28.)

Plaintiff testified that she drove herself to the hearing, which occurred approximately 15 to 20 miles from her home. (Tr. 22-23.) Plaintiff also testified that, in

the past year, the furthest distance she has travelled by herself is 15 to 20 miles. (Tr. 23.) While Plaintiff used the wheelchair available at the hearing site, Plaintiff testified that she does not use one on a regular basis except for "going into stores," where she finds it necessary to use one. (Tr. 28.) Plaintiff testified that she does walk with a cane and has been using one since her injury. (Tr. 28.) Plaintiff also testified that she has difficulty walking long distances and has a brace on her right foot. (Tr. 31.)

As for her medical treatment, Plaintiff testified that she is currently taking Neurontin and nortriptyline and seeing Dr. Gelfman at the Mayo Clinic in connection with her worker's compensation injury. (Tr. 28-29; *see* Tr. 419.) Plaintiff testified she does not have health insurance and attends a free clinic, which covers her Mayo Clinic visits when coordinated through the free clinic. (Tr. 29.) Plaintiff does not otherwise seek medical treatment. (Tr. 29.) When asked by the ALJ if she had been able to receive the treatment she wanted through the free clinic, Plaintiff responded that she had. (Tr. 29.) Plaintiff also testified that the last time she went in for treatment of leg pain was in 2009. (Tr. 30.) In addition, at the hearing, the ALJ noted that the record contained "a pretty good gap here in terms of treatment." (Tr. 20.)

Limiting Plaintiff to sedentary work with the ability to elevate her leg, the vocational expert testified that Plaintiff could work as a receptionist, general clerk, and surveillance monitor. (Tr. 34-35.)

### B. Post-Hearing Consultative Examination

Following the hearing, Plaintiff had an orthopedic consultative examination by Richard Huset, M.D. (*See* Tr. 432-33.) Dr. Huset noted that Plaintiff has been diagnosed

with CRPS in her left knee and, within the past two months, Plaintiff's right foot "has become pressure sensitive and carries a new diagnosis of plantar fasciitis." (Tr. 428.) When asked to describe her pain, Plaintiff reported that "[a]ny light touch or even air flow change can trigger severe pain from the left knee which brings tears and shouts of pain." (Tr. 428.) Plaintiff stated that movement does not generally trigger pain, but "holding the leg rigidly extended with bracing and [a] stool prevents most motion triggers." (Tr. 428.) Plaintiff reported that even clothing is painful on her knee, so she only wears shorts. (Tr. 428.) Plaintiff described her pain as lightening jolts with electrical tingling and severe. (Tr. 428.)

Plaintiff told Dr. Huset that "[s]he is totally housebound, friends and family must come to her, groceries are ordered into the house, [and] even in the house[,] she struggles to find a leg-extended seated position in front of the computer to do what she can for communication." (Tr. 428.) Plaintiff stated that she can stand for only five to ten minutes and has jolting pain if she walks more than 50 to 100 feet. (Tr. 428.) Plaintiff told Dr. Huset that she is able to manage her own personal care and dress, as well as perform simple cooking "with help when possible," but gets assistance with household cleaning. (Tr. 428.)

Dr. Huset noted that "[c]lassic pain oral medications failed" and Plaintiff was now using Neurontin "with some benefit." (Tr. 429.) Plaintiff reported that she had tried lumbar sympathetic blocks, but these had also failed to provide her with relief. (Tr. 429.)

Dr. Huset tested Plaintiff's head and neck, as well as her thoracic and lumbar spine, noting that her range of motion was 100% and there was no tenderness or spasms.

(Tr. 429.)  As for the joints in Plaintiff's upper and lower extremities, Dr. Huset found Plaintiff's range of motion to be 100% "except [for her] left knee, [which was] limited 50% by hypersensitivity to touch and motion."  (Tr. 429.)  Dr. Huset also noted that Plaintiff was able to demonstrate full range of motion in her left knee "if she tries with effort to demonstrate her exercise routine."  (Tr. 429.)  Dr. Huset observed that "[a]ny one touch produces 3-4 minutes of tearful pain, which then fades rapidly."  (Tr. 428; *see also* Tr. 429.)  Dr. Huset noted that Plaintiff "holds the left knee rigid in full extension when seated or even when leaning at temporary rest in walking."  (Tr. 429.)

Dr. Huset stated that Plaintiff walked with a cane, resulting in a normal but slow gait and avoidance of painful maneuvers.  (Tr. 428, 430.)  Dr. Huset noted that Plaintiff's cane does not prevent her pain but provides stability when Plaintiff experiences pain and stated that the cane was "[h]elpful and necessary to achieve any effective mobility."  (Tr. 430.)  Dr. Huset described Plaintiff's ability to climb and descend stairs as "[s]low and deliberate but possible in urgent situations."  (Tr. 430.)

Dr. Huset did not find evidence of nerve root irritation, but noted that Plaintiff's left knee was extremely sensitive to touch.  (Tr. 430.)  Plaintiff's reflexes were otherwise normal.  (Tr. 430.)  Plaintiff also registered 5/5 in muscle strength and had normal muscle bulk.  (Tr. 430.)  Dr. Huset tested Plaintiff's ability to get up from a seated position, get on and off of the exam table, walk on her heels and toes, and tandem walk, finding them all to be within normal limits.  (Tr. 431.)  Dr. Huset found Plaintiff's ability to sit and stand to be "[n]ormal with effort," noting that "[p]ain interferes."  (Tr. 431.)  Plaintiff was able to reach overhead and had no trouble with finger dexterity.  (Tr. 431.)  Dr.

Huset also noted that Plaintiff "is well able to adjust her environment to minimize her problem." (Tr. 431.)

Ultimately, Dr. Huset concluded that Plaintiff put forth a "fully sincere solid effort" and her "[p]ain is clear and evident as well." (Tr. 431.) Dr. Huset diagnosed Plaintiff with CRPS and plantar fasciitis. Dr. Huset opined that Plaintiff was able to stand for 10 to 15 minutes and would not be able to sit in a workplace setting, whereas "in her carefully set up home, [Plaintiff could sit] perhaps 1 hour at a time." (Tr. 431.) Dr. Huset limited Plaintiff's ability to lift and carry to 20 pounds. (Tr. 431.)

## C. Decision of the ALJ

The ALJ found and concluded that Plaintiff has not engaged in substantial gainful activity since June 1, 2005; Plaintiff has the severe impairments of obesity and CRPS; and these impairments, when considered individually or in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 10-11.) The ALJ found that Plaintiff has the residual functional capacity to perform sedentary work "with the ability, occasionally, to elevate her leg from below the knee on a chair." (Tr. 11.) In consideration of Plaintiff's age, level of education, work experience, and sedentary residual functional capacity, the ALJ concluded that a significant number of jobs exist in the national economy that Plaintiff could perform and, therefore, Plaintiff has not been under a disability, as defined in the Social Security Act, through December 31, 2009. (Tr. 15.)

In reaching his decision, the ALJ found that, while Plaintiff was limited by her physical impairments, the medical record lacked "the type of significant clinical and

laboratory abnormalities one would expect if [Plaintiff] were in fact disabled." (Tr. 12.) The ALJ noted that, in 2005, Plaintiff told her doctor she could sit for extended periods of time without too much trouble so long as she was able to elevate her leg. (Tr. 12.) The ALJ noted that, while Plaintiff's left knee was "exquisitely tender," the rest of her leg was only somewhat swollen and "just slightly more erythematous." (Tr. 12.) The ALJ also noted that Plaintiff's doctor believed that the CRPS was stable and encouraged Plaintiff to increase her activity level. (Tr. 12.)

Between 2006 and 2009, the ALJ found that Plaintiff's condition remained relatively unchanged and, while Plaintiff continued to experience pain and some swelling in her leg, she was encouraged to participate in physical therapy to address her deconditioning. (Tr. 12.) Plaintiff was also able to extend and flex her knee fully, albeit with some discomfort. (Tr. 12.) Further, despite Plaintiff's report that she felt her condition was getting worse, Plaintiff's medication was left unchanged. (Tr. 12.)

The ALJ also found that Plaintiff's activities were not consistent with claims of a disabling impairment. (Tr. 13.) Citing Plaintiff's gardening activities and her ability to drive between 15 and 20 miles, the ALJ concluded that Plaintiff was not "housebound" in contradiction to what she told Dr. Huset. (Tr. 13.) The ALJ also credited Dr. Huset's opinion that Plaintiff was able to adjust to her environment. (Tr. 13.) Ultimately, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms," but that Plaintiff's statements concerning the limiting effects of these symptoms were not entirely credible. (Tr. 13.)

Indicating that state agency consultants placed Plaintiff at a light exertional level,[5] the ALJ concluded it was appropriate to further limit Plaintiff to sedentary work based on Plaintiff's "subjective reports of pain and limited mobility."  (Tr. 13.)  Concluding that Plaintiff was not able to perform her past relevant work and that Plaintiff's nursery activities were not substantial gainful activity, the ALJ turned to Plaintiff's ability to perform sedentary work.  (Tr. 14.)  Noting that Plaintiff's "ability to perform all or substantially all of the requirements of this work was impeded by additional limitations," the ALJ concluded that Plaintiff was able to perform the duties of a receptionist and security monitor as well as general clerical duties, which, while classified as light work, the vocational expert testified that she had previously seen performed at a sedentary level. (Tr. 15.)

## V. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).  "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision."  *Id.*  This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it."  *Id.*  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ."  *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).  "If, after reviewing the record, the court

---

[5] Although neither party challenges the weight accorded to the state agency consultants, the Court notes that these consultants all assessed Plaintiff at a sedentary level.  (Tr. 314, 335, 403, 415.)

finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* (quotation omitted).

Disability benefits are available to individuals who are determined to be under a disability. *See* 42 U.S.C. § 423(a)(1); *see also* 20 C.F.R. § 404.315. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a)(4). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

Plaintiff's arguments are all directed at the ALJ's determination of her residual functional capacity. "R[esidual functional capacity] is defined as the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (quotation omitted). Because a residual-functional-capacity assessment is a medical question, "it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092. When assessing residual functional capacity, "the ALJ should consider all relevant evidence, including medical records, the observations of doctors and third parties, and the claimant's own descriptions." *Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004). Nevertheless, while a residual-functional-capacity "assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted).

Plaintiff's first argument—the extent to which she needs to have her leg elevated—is more easily understood through the lens of the hypothetical posed to the vocational expert. Accordingly, the Court begins with her second and third arguments, which challenge the weight accorded to Plaintiff's credibility and certain medical opinions.

## A. Credibility/Complaints of Pain

The ALJ is required to take into account subjective complaints of pain when determining a claimant's residual functional capacity. *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011); *see also Perks*, 687 F.3d at 1092. "When analyzing a claimant's subjective complaints of pain, the ALJ must examine: (1) the claimant's daily activities,

(2) the duration, frequency and intensity of the pain, (3) precipitating and aggravating factors, (4) the dosage, effectiveness and side effects of any medication, and (5) functional restrictions." *Perks*, 687 F.3d at 1092-93 (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The ALJ may properly discount the claimant's testimony where it is inconsistent with the record." *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011). Nevertheless, the "ALJ cannot simply reject complaints of pain because they were not supported by objective medical evidence." *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). While the ALJ must consider the above factors, the ALJ need not discuss each one individually and may conclude that the claimant's subjective complaints of pain are inconsistent with the evidence as a whole so long as the ALJ "detail[s] the reasons for discrediting the testimony and set[s] forth the inconsistencies found." *Id.* (quotation omitted). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003).

Plaintiff asserts that the ALJ's decision to discount her complaints of pain and the limiting effects of that pain is not supported by substantial evidence. (Pl.'s Mem. in Supp. at 14, Docket No. 11.) Plaintiff argues that she testified that her nursery work was "very slow going," she spends much of the time in a seated position with her leg raised, and she can only work for a few hours before needing to take a break. (Pl.'s Mem. in Supp. at 15.) Plaintiff also contends that her sewing activities can be done sitting down at her own pace, without requiring any production goals. (Pl.'s Mem. in Supp. at 16.) In addition, Plaintiff argues that the ALJ incorrectly determined that her testimony

concerning her ability to drive was inconsistent with statements she made to Dr. Huset about being "housebound." (Pl.'s Mem. in Supp. at 16.)

The Commissioner responds that the ALJ properly discounted Plaintiff's subjective complaints given the inconsistencies between Plaintiff's daily activities and her complaints of pain, particularly since the ALJ included Plaintiff's need to work in a seated position with her leg elevated in the hypothetical posed to the vocational expert. (Def.'s Mem. in Supp. at 12-13, Docket No. 18.) The Commissioner also points out that Plaintiff herself reported doing activities such as cooking, washing dishes, laundry, attending to her personal care, and driving—activities that the Commissioner asserts are inconsistent with complaints of disabling pain. (Def.'s Mem. in Supp. at 12.) Additionally, the Commissioner contends that the ALJ properly considered Plaintiff's "housebound" statement to Dr. Huset to be an exaggeration based on Plaintiff's testimony concerning her ability to drive 15 to 20 miles and gardening/greenhouse activities. (Def.'s Mem. in Supp. at 14.)

In discounting Plaintiff's subjective complaints of pain, the ALJ focused on inconsistencies between Plaintiff's testimony concerning her activities and the "housebound" description Plaintiff had given to Dr. Huset. (Tr. 13.) These activities included attempting to start a nursery, raising and selling vegetables, sewing, and driving up to 15-20 miles. (Tr. 13.) The ALJ also pointed to medical records demonstrating that Plaintiff's CRPS had been relatively stable since 2005. (Tr. 12.) The ALJ noted that Plaintiff's medical records indicate that, while Plaintiff's left knee was extremely tender, Plaintiff's lower left leg was generally only slightly swollen when compared to the right.

(Tr. 12.)  Further, while Plaintiff showed discomfort with motion, Plaintiff's medical records also show that Plaintiff could demonstrate full range of motion and fully extend and flex.  (Tr. 13.)  The ALJ also found that there have been no significant changes in Plaintiff's condition over the last four and one-half years.  (Tr. 12-13.)  Moreover, the ALJ noted that Plaintiff's doctors encouraged her to be more active.  (Tr. 12.)

Based on the medical evidence and Plaintiff's reported activities, the ALJ properly discounted Plaintiff's subjective complaints of pain and substantial evidence in the record supports the ALJ's credibility determination.  First, the objective medical evidence does not support pain of the intensity, persistence, and limiting nature alleged by Plaintiff. The record reflects that Plaintiff generally sought treatment just a couple of times per year and these visits were often related to medication management.[6]  "Infrequent treatment is . . . a basis for discounting a claimant's subjective complaints."  *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004).  While Plaintiff's treatment providers documented intense pain in Plaintiff's left knee, other test results were usually unremarkable and showed that Plaintiff could fully extend and flex her left leg with

---

[6] "[A]n individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling."  *Moraine v. Soc. Sec. Admin.*, No. 08-cv-5982 (JRT/RLE), 695 F. Supp.2d 925, 958 (D. Minn. 2010).  "It is for the ALJ in the first instance to determine [the claimant's] motivation for failing to follow prescribed treatment or seek medical attention."  *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989).  At the hearing, Plaintiff testified that she does not have medical insurance.  (Tr. 29.)  "[L]ack of financial resources may in some cases justify the failure to seek medical attention."  *Id.* (quotation omitted)); *see also Tang v. Apfel*, 205 F.3d 1084, 1086 (8th Cir. 2000) (claimant's "inability to afford medication cannot be used as a basis for denial of benefits").  "[A]n ALJ must not draw any adverse inferences about a claimant's symptoms and their functional effects from a failure to pursue regular medical treatment without first considering whether the failure was caused by the claimant's inability to afford treatment or obtain access to free or low-cost medical services."  *Routh v. Astrue*, 698 F. Supp.2d 1072, 1079 (E.D. Ark. 2010) (citing Soc. Sec. Rul. 96-7p, 1996 WL374186, at *7-8 (S.S.A. 1996)).  After Plaintiff testified that she lacked insurance, the ALJ immediately asked Plaintiff whether she was able to get the treatment she wanted through the free clinic and Plaintiff responded unequivocally that she was able to do so.  (Tr. 29.)

effort.  Plaintiff also repeatedly stated that her pain improved when she sat down and elevated her leg.

Due to the limited medical record, the ALJ referred Plaintiff for a post-hearing consultative examination, where Dr. Huset confirmed that Plaintiff could demonstrate full range of motion in her left leg with effort and that pain brought on by contact with Plaintiff's left knee resolved quickly.  Moreover, while Dr. Huset did find that Plaintiff's pain interfered with her ability to sit, Dr. Huset nonetheless determined that she was able to sit and stand within normal limits with effort and able to make adjustments to her environment to minimize the pain.  While the ALJ cannot discount subjective complaints of pain solely because of the absence of objective medical evidence, the absence of such evidence factors into the ALJ's assessment of the Plaintiff's credibility.  *Halverson*, 600 F.3d at 931-32; *see also Teague*, 638 F.3d at 615 (where CT scans and neurological examinations did not reveal significant abnormalities and record lacked medical findings of specific limitations related to pain, substantial evidence supported ALJ's decision to discount claimant's subjective pain complaints).

Second, Plaintiff's activities are inconsistent with disabling pain.  "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility."  *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001).  Perhaps most significantly, Plaintiff herself testified that she spends nearly 40 hours per week, albeit in a seated position, working in her greenhouse with occasional breaks.  Plaintiff is also able to care for herself as well as cook, do laundry, wash dishes, drive, and do some cleaning.  These activities are inconsistent with complaints of disabling pain.  *See*

*Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."); *Gray v. Apfel*, 192 F.3d 799, 804 (8th Cir. 1999) (ability to care for oneself, do household chores, drive for short distances, and do other miscellaneous activities inconsistent with complaints of disabling pain).

The Court does not doubt that Plaintiff's pain is real. *See Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999) ("As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." (quotation omitted)). Nonetheless, the ALJ properly assessed Plaintiff's credibility concerning the severity of her pain in light of the inconsistencies between the alleged pain and her daily activities and the medical evidence. *See Medhaug*, 578 F.3d at 816. Therefore, the Court concludes that there is substantial evidence in the record to support the ALJ's determination that Plaintiff's pain was not as disabling as alleged.

## B. Weight Accorded to Medical Opinions

Plaintiff next argues that the ALJ failed to weigh properly the opinions of both her treating physicians and the consultative examiner, Dr. Huset. (Pl.'s Mem. in Supp. at 16.)

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting 20 C.F.R. § 404.1527(b)). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The

ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Id.* (quotation omitted).

The opinions of treating physicians are generally given controlling weight when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Halverson*, 600 F.3d at 929. Plaintiff asserts that "[a]ll [of] the Doctors who have examined and treated [her] have found her credible, her description of her symptoms consistent with what would result from her condition, and believe that her daily functioning is severely limited" and that "[t]he ALJ by and large ignore[d] or failed to adequately consider those parts of the medical record inconsistent with his own assessment." (Pl.'s Mem. in Supp. at 17.) But as the Commissioner points out, Plaintiff does not identify any particular treating physician's opinion or portion thereof that the ALJ improperly considered.

Further, the ALJ did conclude that Plaintiff's CRPS "could reasonably be expected to cause" the symptoms alleged by Plaintiff, just not with the intensity, persistence and limiting effects claimed. (Tr. 13.) Residual functional capacity is "an assessment of what [Plaintiff] can and cannot do, not what [s]he does and does not suffer from." *Mitchell v. Astrue*, 256 Fed. App'x 770, 772 (6th Cir. 2007); *accord Martise*, 641 F.3d at 923. Finally, none of Plaintiff's treating physicians described her as severely limited.

As for Dr. Huset, Plaintiff argues that the ALJ relied heavily on those parts of Dr. Huset's report concerning Plaintiff's ability to move and extend her knee, but then "gave

no consideration" to Dr. Huset's observation that Plaintiff's severe pain was readily apparent or his conclusion that Plaintiff is unable to tolerate sitting in a work environment.  (Pl.'s Mem. in Supp. at 17.)

An ALJ is required to consider every medical opinion received.   20 C.F.R. § 404.1527(c).  The opinions of non-treating sources, like Dr. Huset, are evaluated based on the examining relationship, treatment relationship, amount of evidence in support of the opinion, opinion's consistency with the record as a whole, and specialization, if any, of the source as well as any other factors raised by the parties.  *Id.*  "The ALJ must at least minimally articulate reasons for crediting or rejecting evidence of disability. . . . and may not simply draw his own inferences about plaintiff's functional ability from medical reports."  *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004).

With respect to Dr. Huset's statements concerning Plaintiff's pain, it is significant that the ALJ did not conclude that Plaintiff was without pain.  The ALJ simply found that her pain was not as intense, persistent or limiting as she has alleged.  Moreover, Dr. Huset's conclusion that Plaintiff's pain is readily apparent is but one factor the ALJ is to consider when determining the extent to which pain limits Plaintiff's ability to work.  *See* 20 C.F.R. § 404.1529(c)(1).  In making a determination on how a claimant's pain limits her ability to work, the ALJ is required to consider "all of the available evidence," including objective medical evidence and information concerning how pain affects the claimant from the claimant herself, the claimant's treating and nontreating sources, and other individuals.  20 C.F.R. § 404.1529(c)(1)-(4).  As previously discussed, the ALJ assessed the credibility of Plaintiff's subjective pain complaints in light of the objective

medical evidence and her activities. In this assessment, the ALJ specifically noted that Plaintiff's hearing "testimony is in conflict with what [she] reported to Dr. Huset." (Tr. 13.) While Dr. Huset's opinion is generally entitled to more weight as he examined Plaintiff, *see* 20 C.F.R. § 404.1527(c)(1), the ALJ still had to reconcile this opinion with the evidence in the record as a whole, *see* 20 C.F.R. § 404.1527(c)(4); *Wagner*, 499 F.3d at 848.

Turning to Dr. Huset's conclusion that Plaintiff is unable to tolerate sitting in the work place, the Commissioner asserts that the ALJ properly rejected this opinion because it was "inconsistent with the rest of Dr. Huset's report and with the Plaintiff's own testimony." (Def.'s Mem. in Supp. at 15.) Citing *Strongson* and *Dolph v. Barnhart*, 308 F.3d 876 (8th Cir. 2002), the Commissioner argues that Dr. Huset's opinion was conclusory, inconsistent with Dr. Huset's own findings, and inconsistent with Plaintiff's testimony. (Def.'s Mem. in Supp. at 15.)

Both *Strongson* and *Dolph* are distinguishable from the present case. In *Strongson*, the claimant's psychologist wrote a letter and completed a medical source statement concerning the claimant's condition and limitations. 361 F.3d at 1071. The psychologist's comments were generally positive, noting improvement in the claimant's condition. *Id.* In the medical source statement, the psychologist

> indicated numerous areas in which [the claimant] was not significantly limited and noted several moderate limitations . . . . The only area in which [the psychologist] believed [the claimant] was markedly limited, however, was in her ability to complete a normal workday without interruption from psychologically-based symptoms and the need for significant rest periods.

*Id.* Pointing to the ALJ's "specific[] not[ation] that [the psychologist's] opinion was without explanation or support from clinical findings and was not internally consistent with his own treatment notations," the Eighth Circuit concluded that "[i]t was reasonable for the ALJ to give limited probative value to the conclusory statement that [the claimant] was vocationally impaired . . . ." *Id.* (quotation omitted). In the present case, however, the ALJ stated that Dr. Huset's opinion "supports the residual functional capacity reached in this decision and *is accorded great weight*" without discussing his opinion concerning Plaintiff's inability to sit in the workplace. (Tr. at 13. (emphasis added).)

In *Dolph*, the claimant had several impairments which required her to see multiple medical providers. 308 F.3d at 877-78. The ALJ credited the opinions of the doctor who treated the claimant's kidney disease concerning the effects of that impairment, but gave less weight to the opinion of the same doctor concerning any neck and arm impairments because the doctor had not treated the claimant for these disorders and made no findings concerning these disorders. *Id.* at 879. Further, the neck and arm disorders were outside of the doctor's specialty. *Id.* In addition, the doctor did not opine on the claimant's ability to work part time or full time. *Id.* Based on the foregoing, the Eighth Circuit concluded that there was substantial evidence in the record to support the ALJ's treatment of the doctor's opinion. *Id.* Again, as distinguished from the present case, the ALJ provided specific reasons for discounting the opinion. *See Strongson*, 361 F.3d at 1070.

Nevertheless, the Eighth Circuit has also held that, "'[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted.'" *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Black*, 143 F.3d at 386 (citation omitted). While involving the evaluation of a treating physician's opinion, *Black* is particularly instructive. In *Black*, the claimant's treating physician characterized her scoliosis as extreme and opined that the claimant was "much more handicapped than many of the people presently receiving disability." *Id.* at 385. "The ALJ's decision discussed the medical evaluations contained in [the treating physician's] letter and noted relevant information from the doctor's treatment notes," yet, while "incorporat[ing] [the treating physician's] findings into his decision, [the ALJ] did not specifically discredit the physician's conclusions." *Id.* at 386. The Eighth Circuit held that, "[g]iven the ALJ's specific references to the medical findings set forth in [the treating physician's] letter, it is highly unlikely that the ALJ did not consider and reject [the treating physician's] opinion that [the claimant] was disabled as a result of her extreme scoliosis." *Id.*

Similarly, in *Wildman*, the ALJ did not specifically discuss the opinion of the claimant's psychiatrist "that [the claimant] was 'markedly limited' by her medical problems." 596 F.3d at 966. The ALJ did, however, "cite[] [the psychiatrist's] notations regarding [claimant's] mental status in his decision." *Id.* On appeal, the claimant argued that the ALJ "erroneously 'ignored'" the report of her psychiatrist. *Id.* Relying on *Black*, the Eighth Circuit held that, "[g]iven the ALJ's specific references to findings

in [the psychiatrist's] notes, we find it 'highly unlikely that the ALJ did not consider and reject' [the psychiatrist's] statement that [the claimant] was markedly limited." *Id.* (quoting 143 F.3d at 386).

Certainly, it would have been preferable for the ALJ to have directly addressed Dr. Huset's opinion concerning Plaintiff's ability to sit in the workplace. *See Strongson*, 361 F.3d at 1070. Yet, given the ALJ's specific reference to numerous findings from Dr. Huset, it is highly unlikely that the ALJ did not consider and reject Dr. Huset's opinion that Plaintiff could not tolerate sitting in the workplace. *See Wildman*, 596 F.3d at 966; *Black*, 143 F.3d at 386. Notably, this opinion was internally inconsistent with Dr. Huset's findings that Plaintiff was able to rise from a chair normally and sit normally with effort as well as his observation that Plaintiff is able to adjust to her environment to minimize her problem. Accordingly, the Court concludes that there is substantial evidence in the record to support the ALJ's treatment of Dr. Huset's opinion. *See Wagner*, 499 F.3d at 848; *Strongson*, 361 F.3d at 1070.

## C. Sedentary Residual Functional Capacity

Finally, Plaintiff argues that the ALJ erred in determining that she has the residual functional capacity to perform sedentary work with the ability to "occasionally" elevate her leg on a chair. (Pl.'s Mem. in Supp. at 13.) Plaintiff argues that, at the hearing, she testified that she needed to elevate her leg at all times otherwise pain develops in her knee and travels into her back. (Pl.'s Mem. in Supp. at 13.) In addition, Plaintiff asserts that her medical records do not show that she is able to perform sedentary work with only

occasional elevation of her leg and this residual-functional-capacity determination is inconsistent with the opinion of Dr. Huset. (Tr. 13.)

The Commissioner contends that, even assuming the ALJ erred *by writing* that Plaintiff only needed to occasionally elevate her leg, such error was harmless because the ALJ included continuous elevation of the leg in the hypothetical posed to the vocational expert and the vocational expert opined that there were jobs Plaintiff could perform despite this limitation. (Def.'s Mem. in Supp. at 10-11.) Thus, the Commissioner argues that the ALJ actually posed a hypothetical person with a more restrictive residual functional capacity than described in the ALJ's decision and the vocational expert nevertheless testified that jobs were available. (Def.'s Mem. in Supp. at 10.)

Again, Plaintiff's residual functional capacity represents the most she can do despite her physical limitations. 20 C.F.R. § 404.1545(a)(1); *Martise*, 641 F.3d at 923. "A limited ability to perform certain physical demands of work activity, such as sitting, standing, [and] walking . . . , may reduce [a claimant's] ability to do past work and other work." 20 C.F.R. § 404.1545(b). The ALJ "chose[] to further reduce [Plaintiff's] exertional capacity [to sedentary] based on her subjective reports of pain and limited mobility." (Tr. at 13.) Sedentary work is defined as work which

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

When it came time for examination of the vocational expert, the ALJ specifically proposed an individual who could perform sedentary work *and* also needed to elevate her leg. (Tr. 34.) Before testifying whether there were jobs available in the national economy for a person of Plaintiff's age, education, work experience, and residual functional capacity, the vocational expert asked for further clarification on how Plaintiff elevates her leg when seated. (Tr. 34.) Plaintiff testified that, when she is in a seated position, her leg is out in front of her with a chair just off to the side and she is able to work on the table in front of her. (Tr. 34.) The vocational expert then testified that Plaintiff could perform the requirements of a receptionist, general clerk, or security monitor. (Tr. 35.) The ALJ specifically relied on this testimony in concluding that Plaintiff was not under a disability and Plaintiff "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (Tr. 15.)

While the ALJ's opinion characterized Plaintiff's ability to elevate her leg as occasional, it is clear from the testimony at the hearing and the ALJ's analysis at step five that, even if Plaintiff needed to elevate her leg on a sustained basis, there were still jobs in the national economy that Plaintiff could perform. The hypothetical posed to the vocational expert was actually more restrictive than Plaintiff's residual functional capacity as determined by the ALJ. *Cf. Martin v. Barnhart*, 501 F. Supp. 2d 1179, 1186 (N.D. Ind. 2007) (differences between hypothetical and residual-functional-capacity assessment not fatal when hypothetical was more restrictive than residual-functional-capacity assessment); *accord Mitchell v. Astrue*, 256 Fed. App'x 770, 772 (6th Cir. 2007)

46

(no error absent evidence showing that functional limitations omitted from hypothetical were more restrictive than those limitations included in hypothetical).

"The facts in the hypothetical are designed to replicate the Plaintiff's [residual functional capacity], so as to allow the [vocational expert] to identify jobs in the economy, if any there be, which an individual, with functional limitations like those of the Plaintiff, would be able to perform." *Russell v. Astrue*, No. 07-cv-4202 (RHK/RLE), 626 F. Supp. 2d 921, 944 (D. Minn. 2009). "Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007). When a vocational expert describes readily available occupations in which the claimant could engage in response to a hypothetical that captures the consequences of the claimant's impairments and limitations, the Commissioner has successfully demonstrated the claimant's ability to perform work in the economy. *Id.* at 621.

Here, in response to a hypothetical capturing both the exertional limitations of Plaintiff's CRPS to the extent credited by the ALJ and an additional requirement that Plaintiff be able to elevate her leg, the vocational expert testified that there were jobs Plaintiff was capable of performing. The hypothetical contained the very restriction that Plaintiff argues the ALJ should have taken into account. The ALJ used this testimony in reaching the determination that Plaintiff is not disabled. Plaintiff does not challenge the hypothetical posed to the vocational expert. Further, for the reasons discussed above, this Court has already concluded that the ALJ properly weighed the opinions of Dr. Huset.

"Any arguably deficiency . . . in the ALJ's opinion-writing technique does not require [a c]ourt to set aside a finding that is supported by substantial evidence." *Johnson*, 240 F.3d at 1149. The Court concludes that the ALJ's decision is supported by substantial evidence in the record as a whole. *See Halverson*, 600 F.3d at 929; *Medhaug*, 578 F.3d at 813. And, given that the ALJ relied on testimony from the vocational expert directly addressing the restriction that Plaintiff contends the ALJ failed to consider, the omission of this limitation from the ALJ's opinion was harmless.

TNL